[Crim. No. 568. Fourth Dist. July 16, 1945.]

THE PEOPLE, Respondent, v. ED McDANIELS, Appellant.

Jackson Mahon for Appellant.

Robert W. Kenny, Attorney General, and L. G. Campbell, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendant was charged with the murder of one Lenon Morris. A jury found him guilty with a recommendation of life imprisonment, and he has appealed from the judgment and from an order denying his motion for a new trial.

On the evening of October 9, 1944, the appellant and Morris, both negroes, were gambling in a small cabin located about 60 feet to the rear of a saloon in East Bakersfield. They were seated at a small round table and were playing a game known as ''Cotch,'' in which the dealer was supposed to deal the cards from the bottom of the deck. It appears that in the last game played Morris, who was the dealer, claimed the pot and that the appellant accused him of having dealt himself a card from the top of the deck instead of the bottom. The appellant stood

up and drew a pistol from his pocket, and Morris also arose, moved to his left around the table toward the door, and went out through the door. While this was going on the appellant fired four shots at Morris, three of which struck him. Morris ran or stumbled some 60 feet to the rear steps of the main building, where he fell dead. Two of the bullets which struck Morris entered from the front, one going through his right arm and into his chest and the other entering near the joint between the breastbone and the collarbone. The third bullet, which caused his death, entered from the back and severed the major blood vessels of the neck. It was apparently fired when the deceased was in a stooping position.

The appellant remained on the premises until he was arrested. He admits firing these shots and that he took the money in the last pot from the table. He claimed that he wes entitled to this as the deceased had "fouled his hand" by dealing the last card from the top of the deck, and that he shot only in self-defense. He now contends that the evidence is not sufficient to support a verdict of first degree murder and that, in any event, this shooting arose out of a sudden quarrel or heat of passion and that the judgment should be reduced to one of conviction of voluntary manslaughter.

■ Appellant's claim of self-defense is based upon his testimony that he saw the deceased deal the last card from the top; that he accused the deceased of so doing and claimed the pot; that an argument ensued which grew hotter and hotter; that while he was standing up and demanding the pot the deceased shoved the table over against him "with his left hand and that his right hand went beneath the table toward his lap or right pants pocket"; that seeing this motion he believed that the deceased was armed and was attempting to draw a weapon; and that in fear of his life he drew his pistol and fired four shots at the deceased as fast as he could fire them. It is then argued that the fact that one shot struck the deceased in the back might have a reasonable explanation in that the deceased, in trying to get out of the door, would necessarily have to first move around the table until he came to a point where he could turn toward the door, and that he received the bullet in the back during the fraction of a second while he was making this turn.

Assuming that this explanation was a reasonable one the evidence as a whole, including the appellant's testimony, jus-

tifies other inferences and suggests another explanation which is equally or more reasonable. From all of the circumstances, and in light of all of the testimony, an inference could well be drawn that when the appellant drew his pistol the deceased started for the door, that he was stooping over in a natural effort to avoid the bullets being fired at him, and that the fatal shot struck him in the back as he was going out the door or soon thereafter. No gun was found on the deceased. Another witness, who was seated at the table when the trouble started, testified that when she first saw the gun in the appellant's hand the deceased was seated just where he had been playing, that he had not moved, and that his hands were "up on the table, spreading his money out, you know, putting it together, just greenbacks and had some change there, but he was fumbling with the greenbacks" with both hands. The appellant had previously stated to the officers that when he fired the first shot the deceased was sitting down or in the act of rising, and that when he fired the second shot the deceased's hands were at his side. The appellant also made a statement at the time he was arrested, which need not be repeated here, which indicates that he had considerable animosity toward the deceased. The matters of self-defense and shooting under heat of passion presented questions of fact for the jury and the evidence is entirely sufficient to support its findings.

It is further contended that the court erred in excluding certain evidence which was offered for the purpose of showing that the deceased was the aggressor. A witness called by the appellant was asked whether, in another card game the preceding afternoon, he had seen the deceased "go for his pocket as if he had a gun"; how often he had played in a gambling game with the deceased; whether it was not a fact that in every game he had played with him the deceased had used a "shiner" (mirror); and whether it was not a fact that whenever he was caught using a "shiner" the deceased had "made a bluff for his pocket as if he had a gun." Objections to these questions were sustained and appellant's counsel made an offer of proof offering to prove these things by this witness. The court refused to admit such evidence. It is argued that in many cases the prosecution is permitted to introduce evidence of other instances of similar conduct on the part of a defendant for the purpose of proving intent, motive or common plan or system, even though such evidence discloses a

prior commission of other offenses; that a similar rule should be applied in favor of a defendant; and that a new rule should now be established to the effect that in homicide cases involving the question as to who was the aggressor the defendant should be permitted to prove that the deceased had been in the habit of operating in accordance with a general method, scheme or system, being the one he was using at the time of the killing. It is further argued that this rule should apply whether or not the defendant had any knowledge of the deceased's prior conduct or plan of operation.

The appellant had testified that he did not know that the deceased used a "shiner" on this occasion, and it is not contended that the appellant had ever been told that the deceased had operated in that manner, or that he had ever pretended to reach for a gun when accused of cheating. We are unable to see how any such prior acts and conduct on the part of the deceased in connection with gambling games, if unknown to this appellant, could have affected the question as to who was the aggressor in this instance. The material thing here was not the deceased's custom or method of operation on prior occasions, but what he did immediately or shortly before this shooting took place. The facts in that regard were fully developed, insofar as the witnesses thereto were still alive, and we find no error in the court's ruling in this connection.

The only other point raised is that the district attorney was guilty of prejudicial misconduct in his cross-examination of the appellant. During his cross-examination the appellant testified, in response to a question, "Well, I suppose he rose out of his chair before the shot, the first time, I don't know, I shot as fast as I could shoot." He was then asked whether he saw both of the deceased's hands when the deceased rose up out of the chair, and he replied: "No, I didn't, I couldn't see his right hand." The district attorney, with some typewritten document in his hand, then asked the appellant whether, on the next morning at the jail, a Mr. Woodruff had not asked him where the deceased's hands were when the deceased arose and whether he did not then say to Mr. Woodruff that the deceased's hands were at his side. The appellant replied that he had not said this. Counsel for the appellant asked to be permitted to see the paper the district attorney was holding in his hand and demanded that it be shown to the witness, which requests were refused. Counsel for appellant then asked the district attorney if he had fairly read from the transcript and the district attorney replied that

he had fairly questioned the witness as to a statement made by him. Counsel for the appellant then objected to the district attorney's asking a question "Wherein he purports to read from a record" which had not been shown to counsel or to the witness, assigned this as misconduct and asked the court to instruct the jury to disregard it, which the court refused to do. Later, the Woodruff referred to was called as a witness and the district attorney asked him whether at that time he had asked the appellant where the deceased was sitting when he fired his first shot and whether the appellant had said he was sitting down or in the act of rising. The witness replied "Yes." The district attorney then asked the witness whether he had asked the appellant where the deceased's hands were when he fired the second shot and whether the appellant had replied the deceased's hands were at his side. The witness replied: "Yes, he did." It is contended that these questions and answers were not identically the same as those indicated in the questions as originally asked of the appellant. Any such possible difference goes to the weight of the evidence and not to its admissibility. The main contention in this regard is that the district attorney was reading from a transcript and that this could not be done without first showing it to the witness and asking him whether he had so testified. It is further argued that this use of the transcript was a subterfuge to get before the jury evidence which was otherwise inadmissible.

There is nothing in the record to show that the paper thus used by the district attorney was a transcript, and it cannot certainly be said that the district attorney read anything from that instrument, whatever it was. No attempt was made to use the paper as evidence or to get the contents of the paper before the jury without introducing it in evidence. While he may have used the paper to refresh his memory, all that appears is that he asked certain questions of the appellant with respect to what the appellant had said the morning after the shooting, and later attempted to impeach the appellant by calling another witness to give his version of the statements then made by the appellant. Neither error nor prejudice appears in this connection. Moreover, the record indicates that the district attorney was in good faith attempting to impeach the witness and, even if it be assumed that he was in error, no such prejudicial misconduct appears as would justify a reversal.

The judgment and order appealed from are affirmed.

Marks, J., concurred.